IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,                                             Criminal No. 23-748 KWR

v.

SOLOMON PEÑA,
DEMETRIO TRUJILLO, and
JOSE LOUISE TRUJILLO,

    Defendants,

## DEFENDANT JOSE TRUJILLO'S MOTION TO SUPPRESS

Pursuant to Fed. R. Crim. P. 41(h) and the Fourth Amendment to the United States Constitution, Defendant Jose Louise Trujillo ("Defendant") respectfully moves this Court to suppress all evidence resulting from the January 3, 2023 stop of the Nissan Maxima he was operating, and the ensuing inventory search of that vehicle. As set forth in detail below, the decision to impound the Maxima, and by extension the inventory search conducted in anticipation of such impoundment, violated Defendant's Fourth Amendment rights. At the time it was impounded and searched, the Maxima was parked on private property and posed no immediate threat to public safety. Tenth Circuit case law makes clear that impoundment of a vehicle under such circumstances is constitutional only when the impoundment decision is supported by both a standardized policy and a reasonable community caretaking justification. Because neither of those criteria are met here, the decision to impound the Maxima and the ensuing inventory search violated Defendant's rights as guaranteed by the Fourth Amendment. The unlawful inventory search requires suppression of the evidence obtained as a direct result of that search, as well as all evidence constituting fruits of that search.

I.  **Factual and Procedural Background**

In the early morning hours of January 3, 2023 Bernalillo County Sheriff's Deputy Jonathan Skroch ("Deputy Skroch") initiated a traffic stop on a Silver Nissan Maxima near the intersection of Joe Sanchez Rd. and Barcelona Rd. in Albuquerque. *See* Exhibit A. Deputy Skroch initiated the traffic stop based on what he observed to be an improperly displayed registration sticker, and a suspicion that the vehicle's registration was expired.[1] *Id.* As observable on the dash camera video recording of the stop, after Deputy Skroch initiated the stop, the driver of the Maxima made a right turn onto El Corto Drive and came to a stop in a parking spot in a private parking lot in front of an apartment complex. Ex. B at 00:01-00:30[2]. The below GoogleMaps image, dated April 2022, provides a daylight perspective of the location in which Defendant parked the Maxima after the stop:

---

[1] Pursuant to D.N.M. LR-Crim. 7.1, Defendant has conferred with counsel for the United States and notes that this motion is opposed. Further, pursuant to D.N.M. LR-Crim. 47.10, Defendant states that an evidentiary hearing is necessary in order to afford the United States an opportunity to carry its burden of demonstrating the legality of the search challenged though this motion.

[2] Exhibit B is the video of the traffic stop as recorded from a camera contained in Deputy Skroch's patrol unit. Exhibit C is the video of the traffic stop as recorded from Deputy Skroch's on-body recording device. Copies of these videos have been submitted to the Court on a thumb drive as set forth in Defendant's Notice of Lodging filed contemporaneously with this motion. References to these exhibits in this motion take the form of "Ex. __ at [minute]:[second]."



Deputy Skroch then contacted the driver of the vehicle, who turned out to be Defendant Jose Trujillo. In response to initial questioning, Defendant informed Deputy Skroch that he was headed to his cousin's house after receiving information that his cousin "was fighting with his girlfriend or something." Ex. C at 1:29. Defendant was unable to produce insurance documents for the vehicle and told Deputy Skroch that he did not own the vehicle, but had borrowed it. *Id.* at 2:14.[3] Although Defendant could not produce identification documents, he informed Deputy Skroch of his correct name and date of birth. *Id.* at 2:51-3:25.

After running Defendant through NCIC, Deputy Skroch informed Defendant that Defendant had a possible outstanding warrant for his arrest. *Id.* at 7:08-7:24. Deputy Skroch then informed Defendant of his intention to confirm whether that warrant remained active and that, if the warrant was in fact active, Defendant would be arrested on that basis. *Id.* at 8:44-9:00. In the

---

[3] Evidence produced by the United States in discovery conclusively demonstrates that the Maxima was in fact properly registered at the time of the stop. *See* Ex. D.

minutes that followed, Deputy Skroch confirmed the existence of an active warrant for Defendant's arrest. *See id*. at 16:15-17:10. After confirming the active warrant, Deputy Skroch asked Defendant if there was "anything you want going with you from the car" presumably to take with him to jail. *Id.* at 17:11-17:20. Defendant responded that there was nothing he wanted to retrieve from the vehicle. Deputy Skroch then informed Defendant that "I still have to inventory your car to make sure there's nothing of value in there though we have to document that so if the tow company steals anything…" *Id.* at 17:22-27. Defendant stated "no" and expressed that that he would "rather not" have an inventory search conducted, at which point Deputy Skroch informed Defendant that he would be conducting an inventory search regardless of Defendant's wishes. *Id.* at 17:29-39 ("So that's like not, like I'd—I can't—I'm going to inventory the car; the car's getting inventoried."). In response to Deputy Skroch's stated intention to conduct an inventory search of the vehicle, Defendant can be heard having the following exchange with Deputy Skroch:

    Defendant: "Are you gonna tow it?"

    Deputy Skroch: "Yeah"

    Defendant: "Ok, yeah, yeah go ahead and tow it—just go ahead and tow it, man."

*Id.* at 17:40-17:47.

    Notably, in making the decision to impound the vehicle, Deputy Skroch never consulted the property owner to determine whether there was any objection to the vehicle remaining in the parking lot until it could be retrieved by the registered owner. Nor did Deputy Skroch make any attempt to contact the registered owner of the vehicle to determine whether he could retrieve the vehicle as an alternative to impoundment.

Deputy Skroch then arranged to tow the vehicle and proceeded to conduct an inventory search in advance of the impoundment. *Id.* at 19:24-22:30. That inventory search yielded two plastic bags containing suspected fentanyl pills, which were located in the center console, as well as two firearms, which were located in the trunk. Defendant presently understands that one of the firearms was later subject to ballistic tests, through which law enforcement were able to link that firearm to the January 3, 2023 shooting referenced in Count Four of the Indictment.

Defendant was subsequently charged by indictment with a variety of crimes, the evidence of which flows directly from the drugs and firearms discovered in the course of the inventory search described above. Most directly, Defendant has been charged with violations of 21 U.S.C. § 841(a)(1) and (b)(1)(B) (possession with intent to distribute 400 grams and more of fentanyl) and 18 U.S.C. §924(c)(1)(b)(ii) (possession of a machinegun in furtherance of a drug trafficking crime). *See* Doc. 33 (Counts 10-11). In the same Indictment, Defendant is charged with participation in a series of politically-motivated shootings, at least one of which is alleged to have been conducted using one of the guns discovered in the trunk of the Maxima during the inventory search. *Id.* (Counts 2-9). The evidence discovered through the inventory search led directly to the evidence allegedly connecting Defendant to these shootings. In particular, testimony adduced at Defendant's preliminary hearing makes clear that ballistics tests established a link between one of the firearms located in the trunk of the Maxima and the firearm used at a shooting allegedly occurring shortly after midnight on January 3, 2023 as alleged in Count Four of the Indictment.

## II.   Argument

"The Fourth Amendment provides in relevant part that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." *United States v. Jones*, 565 U.S. 400, 404 (2012) (cleaned up). "To be reasonable, a

search generally requires the obtaining of a judicial warrant. In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *United States v. Venezia*, 995 F.3d 1170, 1174 (10th Cir. 2021). "When a search and seizure is challenged as violative of the Fourth Amendment, the burden is on the government to prove its validity." *United States v. Ibarra*, 955 F.2d 1405, 1408 (10th Cir. 1992).

The Supreme Court has recognized inventory searches of vehicles lawfully impounded by law enforcement as an exception to the Fourth Amendment's warrant requirement. *South Dakota v. Opperman*, 428 U.S. 364 (1976). As set forth below, however, both the Supreme Court and the Tenth Circuit have diligently policed the circumstances under which law enforcement may impound a vehicle and by extension conduct an inventory search.

    A.  *Defendant Has Standing to Contest the Inventory Search of the Vehicle.*

Before delving into the merits of the motion, Defendant bears the initial burden of establishing that he has Fourth Amendment standing to challenge the vehicle search in question. Here, that requirement is readily satisfied. "To establish standing to challenge a car search, the defendant bears the burden of showing that he had a 'legitimate possessory interest in or [a] lawful control over the car.'" *United States v. Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003) (alteration in original) (quoting *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000)). A driver need not be the registered owner of the vehicle to have a reasonable expectation of privacy in the vehicle. Rather, when a vehicle is being operated with the permission of the registered owner, the operator has a legitimate expectation of privacy in the vehicle and by extension standing to challenge a search of that vehicle. *See United States v. Rubio-Rivera*, 917 F.2d 1271, 1275 (10th Cir. 1990) (collecting cases and noting that "[w]here the defendant offers sufficient evidence indicating that he has permission of the owner to use the vehicle, the defendant plainly

has a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle.")

Here, the undisputed evidence makes clear that Defendant had borrowed the Maxima from co-defendant Solomon Peña and was operating the vehicle with Peña's consent. During the stop itself, Defendant repeatedly informed Deputy Skroch that he had borrowed the Maxima and that Solomon Pena was the owner. *See, e.g.,* Ex. C at 2:14; *id.* at 15:08-15:50. Evidence in the form of text messages relied upon by the United States in an affidavit in support of a search warrant provide further support for the fact that Defendant had borrowed the Maxima from Peña and was operating the vehicle with Peña's permission. *See* Ex. E. This evidence is uncontroverted and is sufficient to establish Defendant's standing to challenge the legality of the search in question.

> B. *The Tenth Circuit's Decision in* United States v. Sanders *Provides the Appropriate Rule of Decision.*

There is a wealth of recent Tenth Circuit case law speaking to the circumstances under which law enforcement may, consistent with the Fourth Amendment, impound a vehicle such that an inventory search of the vehicle is constitutional. The seminal case on this question is *United States v. Sanders*, 796 F.3d 1241 (10th Cir. 2015). In *Sanders*, the Tenth Circuit succinctly held that that "impoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified by a standardized policy and a reasonable, non-pretextual community-caretaking rationale." *Sanders*, 796 F.3d at 1248.

Since adoption of this standard in *Sanders*, the Tenth Circuit has repeatedly reaffirmed its validity and relied upon that standard in determining the constitutionality of an impoundment decision when the vehicle in question is located on private property. *See United States v.*

*Braxton*, 61 F.4th 830, 835 (10th Cir. 2023) ("*Sanders* held that impoundment of a vehicle from private property must be 'justified by both [1] a standardized policy and [2] a reasonable, non[]pretextual community-caretaking rationale.'") (alterations in original) (quoting *Sanders*, 796 F.3d at 1248); *United States v. Kendall*, 14 F.4th 1116, 1122 (10th Cir. 2021) (reaffirming framework set forth in *Sanders*); *United States v. Woodard*, 5 F.4th 1148, 1152 (10th Cir. 2021) ("These heightened requirements allow impoundments from private property…only when (1) the car is blocking traffic, (2) the car is posing an imminent threat to public safety, or (3) the impoundment is justified by a standardized policy and a reasonable, non-pretextual rationale of community caretaking."); *United States v. Venezia*, 995 F.3d 1170 (10th Cir. 2021) (restating *Sanders* as applicable standard governing impoundment decision). [4] The impoundment decision at issue here fails to comport with this standard.

First, it is beyond dispute that at the time the impoundment decision was made, the Maxima was parked on private property. *See* Ex. F at 16:15-17:3.

Second, there is no evidence that, at the time the impoundment decision was made, the Maxima was "obstructing traffic" or "creating an imminent threat to public safety" such that the rule in *Sanders* would not apply. *Sanders*, 796 F.3d at 1248. As to the former, it is clear from the video of the stop that, as parked, the Maxima was in no way impeding the flow of traffic. To the contrary, it was parked in a parking area in front of an apartment complex alongside a number of other vehicles, and none of the responding law enforcement officers ever requested that the vehicle be moved prior to impoundment.

---

[4] Although the Tenth Circuit has questioned whether the threat to the public safety must be "imminent" to justify an impoundment, *see United States v. Trujillo*, 993 F.3d 859, 871-72 (10th Cir. 2021), it has never waivered from its holding that impoundment of a vehicle located on private property requires that the vehicle pose a threat to public safety.

Nor is there any evidence that as parked, the Maxima was creating a threat, imminent or otherwise, to public safety. As relevant to this point, the Tenth Circuit has recognized that a vehicle located on private property is less likely to pose any type of risk to the public than one located on a public property such as a roadway. *See Venezia*, 995 F.3d at 1178 (10th Cir. 2021) ("Public safety and convenience are less likely to be at risk when the vehicle is located on private property as opposed to public property.")

The facts of *Venezia* are particularly instructive on this point. In *Venezia*, the defendant had stopped in the parking lot of a motel after being pulled over by police. 995 F.3d at 1173. As it did here, that traffic stop resulted in police identifying an active warrant for the defendant's arrest. Police then arrested the defendant and elected to impound his vehicle and conduct an inventory search. *Id.* at 1174. On appeal from a denial of defendant's motion to suppress, the Tenth Circuit held that that the decision to impound the vehicle did not comport with the standard announced in *Sanders*. Of note, the Tenth Circuit rejected the idea that the vehicle's presence in the motel parking lot presented any type of threat to the public safety. *Id.* at 1180-81 ("There was simply nothing unusual, let alone harmful to public safety or convenience, in leaving Venezia's vehicle overnight in the motel parking lot. Ostensibly, doing so would have been no different than what the motel's guests do on a regular basis."). As in *Venezia*, leaving the Maxima in the apartment complex parking lot would have posed no threat to the public safety simply because doing so would have put the vehicle in no different position from that of a vehicle owned by a resident of the apartment complex or their overnight guests.

Under these circumstances, *Sanders* dictates that impoundment is only permissible if the decision to impound was "justified by both a standardized policy and a reasonable, non-

9

pretextual community-caretaking rationale." *Sanders*, 796 F.3d at 1248. Neither criterion is met here, let alone both.

### C. *The Impoundment Decision Was Contrary to BCSO Policy.*

Both the Supreme Court and the Tenth Circuit have recognized the central role of standardized criteria in determining whether an impoundment decision is constitutional. The Supreme Court recognized as much in *Bertine v. Colorado*, 479 U.S. 367, 375 (1987) when it noted that police discretion over impoundment decisions is permissible "so long as that discretion is exercised according to standard criteria." Applying *Bertine*, the Tenth Circuit has made clear that "the existence of standardized criteria [is] the touchstone of the inquiry into whether the impoundment is lawful." *Sanders*, 796 F.3d at 1248. Adherence to such standardized criteria is critical to ensuring that the impoundment decision is not left to the unbridled discretion of an individual officer. *Id.* at 1249 ("Our requirement that standardized criteria guide impoundments on private property ensures that police discretion to impound vehicles is cabined rather than uncontrolled."). Indeed, the Tenth Circuit has previously held unconstitutional impoundment decisions that deviated from standardized procedures or applicable law. *See, e.g., United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir. 1992) ("Officer Mahaffey's decision to impound the vehicle was made without proper authority under Wyoming law. Therefore his decision was not reasonable and in conformance with the Fourth Amendment unless justified under *Opperman [v. South Dakota*, 428 U.S. 364 (1976).]")

Here, Deputy Skroch's decision to impound the Maxima was contrary to the standardized policies of the Bernalillo County Sheriff's Office ("BCSO") as those policies have been interpreted by the Tenth Circuit. BCSO policy 311-2(J) provides in pertinent part that "[v]ehicles will not be towed from private property unless needed as evidence, or pursuant to a lawful court

order." *See* Exhibit G. While other portions of this BCSO policy provide for impoundment of a vehicle when a driver has been arrested, the Tenth Circuit has expressly addressed this BCSO policy and interpreted it to prohibit impoundment of a vehicle located on private property even if the driver is arrested. *See United States v. Chavez*, 985 F.3d 1234 (10th Cir. 2021).

Like *Venezia*, *Chavez* presents another recent case in which the Tenth Circuit found the decision to impound a vehicle fell afoul of the Fourth Amendment. In *Chavez*, BCSO deputies had initiated a traffic stop, but the driver of the subject vehicle failed to submit to the stop and instead led deputies on a pursuit that ended at the end of a dirt road near a pair of trailer homes at which point the driver seemingly abandoned the vehicle. *Chavez*, 985 F.3d at 1237. As it turned out, the property on which the vehicle stopped was private property, and the defendant lived in one of the nearby trailers. *Id.* at 1238. After locating and arresting the driver, deputies conducted an inventory search of the vehicle in anticipation of an impoundment. That search revealed a firearm, which led to defendant being charged as a felon in possession. *Id.*

Although *Chavez* involved a number of other Fourth Amendment claims not implicated by this motion, on appeal the Tenth Circuit addressed the scope of BCSO's standardized policies governing impoundment of vehicles. Specifically, the Tenth Circuit expressly rejected the district court's conclusion that the inventory search was permissible because it complied with BCSO standardized policies governing impoundment of vehicles. *Id.* The Tenth Circuit held that "the [BCSO] policy *disallowed* the deputies from impounding the car from private property absent exceptions inapplicable here. By the policy's terms, '[v]ehicles will not be towed from private property unless needed as evidence, or pursuant to a lawful court order.'" *Id.* at 1242. (alteration and italics in original). Although the court acknowledged a separate portion of the BCSO policy permitting impoundment in cases of the driver's arrest, it nonetheless interpreted

11

the BCSO policy not to permit impoundments when a vehicle is located on private property even in cases of the driver's arrest. As the court explained

> The district court did not reference the private property exclusion. Instead, the district court relied on a different portion of the Bernalillo policy, one authorizing towing when a driver is "incapacitated, hospitalized, arrested, and/or when the vehicle cannot be released to a registered owner." The district court found that the Bernalillo policy permitted the officers to inventory and impound the car after arresting Mr. Chavez. But because the car was on the owner's private property, the policy barred the deputy from impounding it.

*Id.* (citations omitted).

Because the Maxima was indisputably parked on private property at the time of the impoundment decision, that decision was contrary to BCSO policy. By itself, this violation of policy renders the impoundment decision, and the ensuing inventory search, unconstitutional.

> D. *The Impoundment Decision Was Not Supported by a Reasonable Community-Caretaking Rationale.*

Even if the Court were to conclude that the impoundment decision was consistent with BCSO policy, suppression is nonetheless warranted because that decision was not supported by a reasonable community-caretaking rationale. The concept that law enforcement may impound a vehicle as part of their community-caretaking function is derived principally from *Opperman v. South Dakota*, 428 U.S. 364 (1976). *See Venezia*, 995 F.3d at 1177 ("The second prong [of the *Sanders* test] is primarily derived from *Opperman*, which established that warrantless impoundments may be constitutional when 'required by the community-caretaking functions of protecting public safety and promoting the efficient movement of traffic.'") (quoting *Sanders*, 796 F.3d at 1248).

*Sanders* identifies the following five non-exclusive factors that courts should use to determine whether the impoundment decisions reflects a reasonable exercise of law enforcement's community-caretaking function

12

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

*Sanders*, 796 F.3d at 1250; *see Braxton*, 61 F.4th at 835 (same); *Woodard*, 5 F.4th at 1155 (same); *Venezia*, 995 F.3d at 1178 (same). Application of these factors to the facts presented here undermines any contention that the impoundment decision was supported by a reasonable community-caretaking function.

  1. The Maxima Was Located on Private Property.

As to the first *Sanders* factor, and as noted above, the Maxima was indisputably on private property at the time the impoundment decision was made. This fact cuts heavily against a finding that the impoundment decision was a reasonable exercise of the community-caretaking function. The Tenth Circuit has recognized that "[p]ublic safety and convenience are less likely to be at risk when the vehicle is located on private property as opposed to public property." *Venezia*, 995 F.3d at 1178. Moreover, *Venezia* also identifies this factor as one that carries significant and independent weight in evaluating the community-caretaking justification. *Id.* (the district court erred in concluding that a vehicle's location on private property is not a 'strong factor'"); *id.* ("not only does the first factor weigh against impoundment, the first factor is entitled to more than "'little weight.'").

  2. The Property Owner Was Never Consulted About the Presence of the Maxima.

The second *Sanders* factor—whether the owner of the private property was consulted—also cuts against the reasonableness of the impoundment decision. No one associated with the apartment complex was consulted to determine whether there was any objection to the Maxima remaining in the parking lot. *See Venezia*, 995 F.3d at 1179 (noting that the risk to public safety

13

"is particularly diminished when the private property owner does not object to the vehicle's presence."). And it is no answer to suggest that law enforcement properly inferred that the property owner would want an unauthorized vehicle removed from the parking lot. *See Woodard*, 5 F.4th at 1156 ("courts should consider whether the officers had consulted the property owner and learned of the property owner's preference, not whether the officers had correctly inferred the property owner's preference.")

The Government is likely to argue that this factor should carry relatively little weight under the present circumstances. After all, the traffic stop occurred shortly after 1:30 am, hardly an opportune time to begin knocking on doors in search of a landlord, property manager, or superintendent. But this fact hardly carries the day for the Government. Indeed, in the absence of any objection from an authorized representative of the apartment complex, law enforcement was not justified in concluding that the presence of the vehicle in the parking lot for the remainder of the evening constituted a nuisance or would necessarily have drawn objection. *See Venezia*, 995 F.3d at 1179 ("the second *Sanders* factor goes to the private property owner's enjoyment of his or her private property, i.e., whether the vehicle's presence caused a nuisance.")

### 3. Alternatives to Impoundment Were Readily Available, But Never Explored.

The third *Sanders* factor—whether an alternative to impoundment exists, also cuts against the reasonableness of that decision for precisely the reasons set forth in *Venezia*. One obvious alternative to impoundment was simply to leave the Maxima where it was until Defendant or the registered owner could retrieve it. As the court in *Venezia* explained

> The third *Sanders* factor weighs against impoundment because the vehicle could have remained at the motel parking lot until the motel owner objected to the vehicle's presence, until the officers contacted the vehicle's registered owner, or until there was reason to believe the registered owner could not be contacted and the vehicle would be abandoned. Where an alternative to impoundment does not

14

> threaten public safety or convenience, impoundment is less likely to be justified by a community-caretaking rationale.

*Id.* As in *Venezia*, it is unclear why the Maxima had to be impounded at all, given that it was parked on private property with no objection from the property owner, and was not presenting a safety hazard. *See id.* ("It is unclear, however, why the vehicle needed to be moved at all. The district court found that the vehicle was legally parked, was not impeding traffic, and did not pose a safety hazard.")

Moreover, there is no reasonable explanation for why law enforcement made no effort to contact the registered owner of the vehicle—Solomon Peña. Shortly after initiating the traffic stop, Deputy Skroch obtained the registration to the vehicle, presumably indicating Peña as the owner, and Defendant directly informed Deputy Skroch that he had borrowed the vehicle from "one of my buddies" who Defendant identified as "Solomon." Ex. C at 15:09. Deputy Skroch can be heard less than a minute later stating the name "Solomon Peña." *Id.* at 15:44. Under these circumstances, it was not reasonable for Officers to impound the vehicle, rather than making any effort to contact the registered owner. *See Venezia*, 995 F.3d at 1180 ("First, it was not reasonable for the officers to believe that the registered owner, Luis Cuello, could not be contacted and that the vehicle would be abandoned.") And even if Deputy Skroch had been unable to contact Solomon Peña at that time of night, there was certainly no reason to believe that he would be unreachable the following morning, such that the vehicle would remain parked in its location indefinitely. As *Venezia* explains

> The officers' unsuccessful, late-night attempts to call Cuello do not establish that the vehicle would have been left at the motel indefinitely. Accordingly, there is no reasonable explanation for why the vehicle could not remain in the motel parking lot until Cuello was reached, or why the vehicle needed to be impounded immediately following Venezia's arrest.

15

*Id.* In summary, two immediate alternatives to impoundment existed here. First, Deputy Skroch could have contacted the registered owner to retrieve the Maxima, or he could have left the vehicle parked in in the private lot in front of the apartment complex until it could be determined whether the registered owner could be contacted. As in *Venezia*, the presence of these clear alternatives cuts against viewing the impoundment as a reasonable exercise of the community-caretaking function. *See id.* ("an alternative to impoundment existed—namely, leaving the vehicle in the motel parking lot until the motel owner objected, Cuello objected, or it became reasonable to conclude Cuello could not be contacted and the vehicle would be abandoned.")

    4.   <u>The Maxima Was Not Implicated in a Crime.</u>

The fourth *Sanders* factor, whether the vehicle is "implicated in a crime" also weighs against viewing the impoundment decision in issue here as a reasonable exercise in community-caretaking. Here, although the initial stop was premised on suspicion of an expired registration sticker, Defendant was not arrested for any such violation. Indeed, to date, Defendant has not even been cited for such a violation and the evidence establishes that the Maxima was properly registered at the time of the stop. Rather, Defendant's arrest was predicated on the existence of an active warrant for his arrest. The vehicle has no connection to that warrant and would not have provided any evidence to support the charges underlying that warrant. *See United States v. Barraza*, No. 15-CR-01015 MV, 2016 U.S. Dist. LEXIS 191828, at *17 (D.N.M. June 27, 2016) ("the vehicle was not implicated in a crime at the time Officer Shultz made the impoundment decision"); *United States v. Chavira*, 157 F. Supp. 3d 1073, 1078 (D.N.M. 2015). ("Defendant was arrested on a warrant pursuant to a New Mexico criminal complaint charging Chavira with various drug offenses that, insofar as the Court is aware, in no way implicate the Monte Carlo impounded in this case.").

16

*Venezia* provides further support for this position. In *Venezia*, after the stop had been initiated, the defendant was unable to present a valid registration for the vehicle. *Venezia*, 995 F.3d at 1174. Yet the Tenth Circuit addressed this factor only briefly noting that the vehicle "would not have provided further evidence of the traffic violations or outstanding warrant for which Venezia was arrested." *Id.* at 1182. Here, the facts are even more favorable to Defendant because after the stop was initiated, he was able to demonstrate that the vehicle was appropriately registered.

### 5. Defendant Expressly Declined Consent to the Inventory Search.

Finally, the fifth *Sanders* factor, whether the operator consents to the impoundment, also cuts against a finding of community-caretaking. Here, although Defendant arguably consented to the impoundment (towing) of the vehicle, he did so only after being told that the car was going to be inventoried regardless of Defendant's wishes. *See* Ex. C at 17:05-17:45. This fact cuts against a finding of consent to the impoundment and certainly to the inventory search. *See United States v. Minor*, No. 2:09-cr-00171-RLH-RJJ, 2010 U.S. Dist. LEXIS 29506, at *11 (D. Nev. Mar. 11, 2010) (finding consent invalid where driver was "informed that the vehicle would be searched for inventory purposes prior to consent.") In fact, Defendant himself made this distinction abundantly clear to Deputy Skroch after being made aware of the results of the inventory search. As Defendant informed Deputy Skroch "I said you could tow it, I did not say you could you do inventory on it." Ex. C at 22:37-54. This is a salient distinction. *See United States v. Roth*, 944 F. Supp. 858, 863 (D. Wyo. 1996) ("Patrolman Bauer did not ask Defendant's permission to inventory the truck; rather, the patrolman told the Defendant that an inventory would be done without indicating that Defendant could refuse consent to such a search.").

> E. *Because the Impoundment Decision Was Unlawful, The Ensuing Inventory Search Was Also Unlawful And All Fruits of that Search Must be Suppressed.*

If the decision to impound the Maxima was itself unlawful, the ensuing inventory search was similarly unlawful. *See Chavez*, 985 F.3d at 1242 ("a lawful impoundment is a 'prerequisite to a lawful inventory search'") (quoting *United States v. Lugo*, 978 F.2d 631, 636 n.3); *United States v. James*, No. 18-CR-3494 JB-LF-1, 2019 U.S. Dist. LEXIS 82527, at *19 (D.N.M. May 15, 2019) ("Because the decision to impound Mr. James' car was not lawful, the subsequent inventory search of his car also was not lawful."). Having established that the impoundment and subsequent inventory search were conducted in violation of Defendant's Fourth Amendment rights, suppression is required not only as to the evidence directly resulting from that search, but of all "fruits" of the unlawful search.

To establish that evidence is subject to suppression as the fruit of the poisonous tree, a defendant "must show 'but for' causation; that the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006) (internal quotation marks and citation omitted). Here, it is beyond debate that the suspected fentanyl pills and the firearms located in the Maxima must be suppressed as evidence resulting directly from the unlawful search. But the "fruits" of that search likely extend well beyond the drugs and firearms themselves.

Although additional review of discovery materials is required to ascertain the full range of "fruits" of the unlawful search, it is clear that the discovery of the firearms in the vehicle was the key break that allowed law enforcement to tie Defendant to the January 3 shooting charged in Count Four of the Indictment.[5] As noted above, law enforcement conducted ballistics testing on

---

[5] In a news story addressing the charges related to the shootings, one media outlet noted that "one of the confiscated guns broke open APD's case." *See*

18

these firearms and through such testing were allegedly able to determine that at least one of the firearms discovered in the Maxima was the same firearm used in the shooting charged in Count Four of the Indictment. Such evidence is clearly subject to suppression as a fruit of the unlawful search.

Additional evidence resulting from the unlawful search takes the form of recorded telephone calls that Defendant made from jail. As detailed in Albuquerque Police Department Reports, these calls included at least one call with his father and co-defendant, Demetrio Trujillo. According to APD reports, in the course of this call, Defendant discussed with Demetrio the fact that the Maxima had been searched by law enforcement and included reference to possibly informing Solomon Peña of the seizure. This conversation operated to further link all three co-defendants to the shootings as charged in the indictment and led to further investigative efforts directed at Demetrio Trujillo. In short, none of this evidence would have come to light but for the unlawful search of the Maxima.

## CONCLUSION

For the foregoing reasons, Defendant Jose Trujillo respectfully requests that the Court suppress all evidence and fruits resulting from the unlawful search of the Maxima on January 3, 2023.

Dated: July 15, 2023

                                              Respectfully submitted,

                                              **HOLLAND & HART LLP**

                                                  */s/ John C. Anderson*
By: _____
John C. Anderson

---

https://www.krqe.com/news/investigations/calls-from-jail-accused-shooter-wants-former-political-candidate-solomon-Peña-to-pay-for-lawyer/

110 N. Guadalupe, Suite 1
Post Office Box 2208
Santa Fe, New Mexico  87504-2208
TEL:    (505) 988-4421
FAX:   (505) 983-6043

**Attorney for Defendant Jose Louise Trujillo**

# CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2023, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Assistant United States Attorney Jeremy Peña
Assistant United States Attorney Patrick Cordova
Senior Litigation Counsel Victor Salgado

**Counsel for the United States**

*/s/ John C. Anderson*
John C. Anderson