1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW MEXICO

3    _____
                               )
4    UNITED STATES OF AMERICA,  )    No. 1:23-cr-00748-KWR
                                )
5              Plaintiff,       )
                                )
6       vs.                     )    Bonito Courtroom
                                )    Albuquerque, New Mexico
7    SOLOMON PEÑA,              )
                                )    September 16, 2024
8              Defendant.       )    9:01 a.m.
     _____)

9

10                  TRANSCRIPT OF PROCEEDINGS
                    VOIR DIRE OF WITNESSES
11          BEFORE THE HONORABLE KEA W. RIGGS
               UNITED STATES DISTRICT JUDGE
12
     APPEARANCES:
13
     For the Plaintiff:   JEREMY PEÑA, ESQ.
14                        PATRICK E. CORDOVA, ESQ.
                          Assistant United States Attorneys
15                        201 3rd Street NW
                          Albuquerque, New Mexico  87102
16
                          RYAN R. CROSSWELL, ESQ.
17                        Trial Attorney
                          1301 New York Avenue NW
18                        Washington, D.C.  20005

19   For the Defendant:   ELIZABETH A. HONCE, ESQ.
                          7800 Phoenix NE, Suite C
20                        Albuquerque, New Mexico  87110

21   REPORTED BY:         ANDREA M. LYNCH, RPR, NM CCR #127
                          United States Court Reporter
22                        333 Lomas Boulevard Northwest
                          Albuquerque, New Mexico  87102
23                        Phone:  (505) 348-2093
                          Email:  Andrea_Lynch@nmd.uscourts.gov
24
         Proceedings recorded by mechanical stenography; transcript
25   produced by Computer-Aided Transcription.

I N D E X

Page

ERIN CLEMENTS for the Government
    Direct Examination by Mr. Crosswell            5:15
    Cross-Examination by Ms. Honce                 22:1
    Redirect Examination by Mr. Crosswell          24:1

DAVID CLEMENTS for the Government
    Direct Examination by Mr. Crosswell            27:16
    Cross-Examination by Ms. Honce                 32:15

Court Reporter's Certificate                       45:1

1              <u>September 16, 2024</u>

2       (In open court at 9:01 a.m.)

3              THE COURT:  Good morning.  We are here for hearing in

4   United States v. Solomon Peña, 23-cr-748.

5              Would counsel for the United States identify yourself

6   for the record.

7              MR. CROSSWELL:  Good morning, Your Honor.

8   Ryan Crosswell, Patrick Cordova and Jeremy Peña on behalf of

9   the United States.

10             THE COURT:  Good morning.

11             Counsel for defense.

12             MS. HONCE:  Elizabeth Honce for Mr. Peña, who is

13   seated to my left.

14             THE COURT:  Good morning.  We are here for voir dire

15   of two of the witnesses that Ms. Honce has disclosed on behalf

16   of her client that the United States has objected to.  I

17   understand that they are appearing by video.

18             Good morning, Mr. Clements and Mrs. Clements.  Can you

19   hear the Court?

20             MR. CLEMENTS:  We can.  Good morning.

21             THE COURT:  Thank you for appearing by video.  I will

22   start off by having each of you raise your right hand.

23       (The witnesses were duly sworn.)

24             THE COURT:  I could not hear you.  I'm sorry.

25             MS. CLEMENTS:  I do.

1            THE COURT:  All right.

2            MR. CLEMENTS:  I do.

3            THE COURT:  All right.  Thank you.  You may put your

4    hands down.

5            Now, the United States, who would you like to call

6    first?

7            MR. CROSSWELL:  Your Honor, the United States calls

8    Erin Clements.

9            THE COURT:  Erin Clements?

10            MR. CROSSWELL:  Yes, ma'am.

11            THE COURT:  All right.  Ms. Clements, the United

12    States would you like to talk to you first.  Is there anything

13    that counsel would to bring up before we get started with the

14    questioning?

15            Ms. Honce, anything from you?

16            MS. HONCE:  No.  Only if the -- if the Government is

17    requesting the rule as far as Mr. Clements.  I believe he has

18    exited, but --

19            THE COURT:  All right.  Thank you.

20            Are you invoking the rule?

21            MR. CROSSWELL:  Yes, Your Honor.  We do think they

22    should be sequestered, for lack of a better word, during each

23    other's testimony.

24            THE COURT:  All right.  Ms. Clements, this is

25    Judge Riggs again.  The rule has been invoked.  Is your husband

1  still in the room or has he exited?

2          MS. CLEMENTS:  He has exited.

3          THE COURT:  Thank you.  And he cannot hear you?

4          MS. CLEMENTS:  No.

5          THE COURT:  All right.  Thank you.  You have a very

6  soft voice, ma'am, and since we're on video, I'm probably going

7  to have to have you speak up.  All right?  We have someone who

8  is transcribing this hearing and if I remind you to speak up,

9  that's the reason.

10          THE WITNESS:  Okay.

11          THE COURT:  United States, you may proceed.

12          MR. CROSSWELL:  Thank you, Your Honor.

13                        ERIN CLEMENTS

14          (being duly sworn, testified as follows:)

15                     DIRECT EXAMINATION

16  BY MR. CROSSWELL:

17  Q.  Ms. Clements, can you hear me?

18  A.  Yes.

19  Q.  Thank you for appearing.

20      Where are you currently located?

21  A.  I'm in Las Cruces, New Mexico.

22  Q.  Okay.  And can you tell the Court what you do for a living?

23  A.  I'm a civil structural engineer.  So I do projects from all

24  angles regarding public infrastructure, to do with data

25  analysis of the public's use of that infrastructure to the

1   design of the infrastructure to the overseeing of construction,
2   things like that.
3   Q.  And does any work you do in relation to elections, is that
4   a separate profession or is that part of that profession?
5   A.  It's not -- it's a volunteer, I'd say, aspect of my life.
6   But it is in line with what I've been trained to do as far as
7   data analysis, the math behind it, you know, how systems
8   interact with one another.  So it's not outside my expertise,
9   but it's not my paid profession, if that makes sense.
10  Q.  Okay.  And speaking more about that work, do you make any
11  income from that work, or is it more just something you do not
12  for profit?
13  A.  It's just volunteer.
14  Q.  And, again, speaking to the work you do regarding
15  elections, is it nationwide or more local?
16  A.  It's both.  I -- when I started looking at elections, I was
17  starting just with New Mexico, but as I'm sure you're aware,
18  the vendors and the systems and the software and the data are
19  fairly similar from jurisdiction to jurisdiction.  It varies
20  somewhat, you know, what the rules of an individual state are
21  as far as how elections are conducted, but there's a lot of
22  overlap, and so I have consulted with experts across the
23  country, and I'm fairly familiar with -- I'm the most familiar
24  with New Mexico's elections and processes and data and
25  software, but I've also become familiar with others as well,

1    just because there's a lot of overlap and I know a lot of
2    people that I consult with to try to make my understanding as
3    good as possible.
4    Q.   Okay.  And as you know we're going to speak to your husband
5    as well, but does he receive income or profit from the work he
6    does related to elections?
7    A.   No, he doesn't.  He gets invited to speak and often he'll
8    be reimbursed for his expenses but primarily we're doing this
9    as volunteers.
10   Q.   And maybe more generally, can you describe some of the work
11   that you and your husband do related to the elections?
12   A.   Outside of what I've already said, I'm not sure what -- you
13   mean just, like, details?
14   Q.   Well, yeah.  For example, if someone calls you for a
15   consultation what sort of things are you consulting on?
16   A.   Okay.  So people will call us and ask us:  How the election
17   works; what data is associated with which vendor; what data you
18   might want to examine; if you have questions about an election,
19   how you would, say, reconcile the different records with one
20   another.  We try to advance understanding of how election works
21   and if somebody has questions about it, to bring them to an
22   understanding of what they should be looking for if they have
23   concerns, how they could navigate the statutory framework to
24   get records they need, or who they would need to talk to if
25   they have concerns or want something changed or need records,

1    things like that.

2    Q.  Okay.  So when you say "reconcile records," you mean, like,

3    for instance comparing ballot counts to voter registration or

4    something along those lines?

5    A.  Yeah.  There's a host of records that is created in every

6    election.  So there's voter registration.  There's absentee

7    ballot requests.  There's something called "a cast vote

8    record."  There are ballots.  There are chain of custody

9    records.  There's all kinds of things that get generated in

10   every election, and some are more useful than others to work

11   with.  Some take a long time to analyze, some don't take very

12   long to look at.  There's -- Election Night Reporting is

13   another one, so --

14   Q.  And with regard to the statutory framework, are you

15   referring to -- if a citizen has a question or concern with an

16   election result, you may advise them on how they can go about

17   challenging that election?

18   A.  Yeah.  There's that, and there's also -- elections are to

19   be free, fair and transparent.  And so the transparent side of

20   it would be you need to be comfortable that the election

21   records are reconcilable with one another, that they make sense

22   with the Election Night Reporting, and so -- yeah, so I would

23   help a person, like:  This is what you could look at to either

24   make yourself feel better or justify further investigation, or

25   bringing something to the attention of an official of some

1  kind.

2  Q.  Okay.  And can you just tell me what Audit Force is?

3  A.  It's just a Telegram channel that we started after -- when

4  we started getting involved in this work, a lot of people were

5  asking, "How can we help?"  "What are you learning?"  And so

6  it's was a place we created to -- we could build up a volunteer

7  force.  We would educate.  We could share information.  We

8  could put out calls to action, things like that.

9  Q.  In the Telegram channel, do you have any advertisers on

10 that channel or no?

11 A.  No.  Telegram does its own advertisement, but there's no

12 advertising, as far as I'm concerned.

13 Q.  Okay.  So no compensation for Telegram?

14 A.  No.

15 Q.  Let's transition to how you know Mr. Peña,

16 Mr. Solomon Peña.

17     First, I should ask:  Do you know Mr. Peña?

18 A.  Yeah, I do.

19 Q.  Okay.  And when did you first meet him, either in person or

20 otherwise?

21 A.  I don't believe I've ever met him in person, but I received

22 a call from him after the 2022 election.  I had -- after the

23 2022 election, there's was limited data available to the public

24 at that time.  Really all the public has is the Election Night

25 Reporting, which is a public-facing record, which can be

1    downloaded as the election is ongoing, and I got that data and

2    I plotted it, and there was a couple of races, statewide races,

3    that had impossibilities in the data, anomalies that didn't

4    match with the other races, and I wrote a report highlighting

5    that and calling for additional investigation into this

6    election prior to certification, and I believe Solomon saw that

7    report and he had questions about it.

8    Q.   Did that report deal specifically with his election?

9    A.   It was a -- the -- again, like I said, the only

10   public-facing data that's available at the time is the Election

11   Night Reporting data.  So that would include his race.  It

12   would include data from his county, I would say.  It doesn't

13   include his race because they only have certain races available

14   in that set of data, but it -- since there were anomalies in

15   the statewide races, it justifies further investigation prior

16   to certification --

17   Q.   Okay.  So --

18   A.   -- of the other data that's available, not to me.

19   Q.   Just so I understand, there was some statewide data, there

20   wasn't data related to District 14, his district, but --

21   A.   It would include -- yeah, it includes his county,

22   obviously.

23   Q.   Okay.  So your first contact with him was after this

24   election?

25   A.   Yes.

Q.  And can you describe the general advice or whatever advice
you gave Mr. Peña?

A.  I believe he was asking what he could do, because he had --
he told me that he had been canvassing for his own race for
months, and he had received very positive reactions from the
people in his district.  So I believe he was expecting to do
better than the election result said that he did, and so he
questioned -- he wanted more information about the election to
feel comfortable that the result was actually accurate.

     And so there is a -- there are several things a candidate
can do.  They can -- if the margin of the race is within a
certain number of percentage points, there will be an automatic
recount, but his was not in that range, so that's not a
possibility.  He can still request a recount, but then that's
at the expense of the candidate, which is often prohibitive,
obviously, but there's another way -- there's a record called a
"cast vote record summary" that is created in every county, and
analysis of that quite often can make you feel pretty
comfortable that the election was fair or that it had been
tampered with.

     So what our advice has been to people is to -- he already
had the canvassing side of it, so he knew how -- he had, like,
polling data.  You can think of it that way, and the result
didn't match the polling data.  So if that -- when that
happens, another record you can look at is this cast vote

1  record.  There's analysis that you can do on it to see whether

2  or not the arrangement of votes is consistent with statistical

3  possibility.  So -- and that takes very little time to analyze.

4  It takes maybe a couple of hours.

5       And so we were suggesting that the best path forward with

6  limited time -- because a candidate only has -- there's between

7  10 and 14 days before an election is certified by the

8  canvassing board, which is the county commission, and so

9  typically there's a public meeting in that time period, so you

10  have to rely on just the data that's in your fingertips, and

11  the Election Night Reporting data was all we had.  It showed

12  anomalies, so it justified further investigation prior to

13  certification.

14       So my advice was, "Try to get your county commissioners to

15  request that cast vote record before they certify so that it

16  can be analyzed to see if the order of the votes is consistent

17  with statistical possibility."

18  Q.  Okay.

19  A.  So that was my advice.

20  Q.  So advising him to get cast vote records and to do so

21  before certification?

22  A.  Correct.  Because that would be his only opportunity.  Once

23  the certification meeting happens, there is no -- often there's

24  no public comment at all.  The commissioners just walk in, the

25  county clerk hands them the papers, and they vote on it.  And

1    so if you have any concerns, you probably don't have an

2    opportunity to bring up those concerns unless you have -- you

3    can set up a personal meeting or -- or phone call or something

4    with the county commissioner.

5    Q.  And so do you recall advising him to visit the county

6    commissioners in person before certification?

7    A.  He told -- I believe he talked to one county commissioner

8    before that, and he had told me that he knew him, he lived in

9    his neighborhood.  So I assumed that they had some kind of

10   personal relationship.

11   Q.  Okay.  And after certification, did you give him any advice

12   at that point?

13   A.  Uh, no.  I mean, after certification there's no -- there's

14   no recourse, really, for a candidate if you don't -- there's

15   probably still -- I think there's still maybe a few days that

16   you can file a challenge to the election, but that's typically

17   cost prohibitive to any candidate.

18   Q.  So any actions that he would have taken after certification

19   of the vote would have been on his own without your advice?

20   A.  Yeah.

21   Q.  Do you have any personal knowledge of any actions that he

22   took after certification?

23   A.  No, I don't.

24   Q.  And if he was doing any information gathering, was that at

25   your advice?

1    A.  I was asking for -- "Can we get the cast vote record?"

2    There were people all over the state making the same request of

3    their county commissioners.  I was in touch personally with the

4    county commissioner.

5    Q.  No, I mean after certification.

6    A.  After certification, no.

7    Q.  Okay.  So no personal knowledge of any information

8    gathering he may have done after certification?

9    A.  No personal knowledge, no.

10   Q.  Okay.  And did you ever advise him about conducting

11   surveillance on any county commissioner's home?

12   A.  No.

13   Q.  And certainly you have no knowledge that there was any

14   shootings involved, you have no knowledge of that?

15   A.  No.

16   Q.  No personal knowledge.

17       I'm going to read you a quote from the *Albuquerque Journal*,

18   and I just want to get your comments on it, and this was about

19   six days ago:  "David Clements said in a phone interview Friday

20   that he and his wife, Erin, have analyzed problems with

21   election machines and have given 'general advice' to people who

22   suspect they have unfairly lost an election, but Clements said

23   he has not communicated with Peña or relied on him to collect

24   data about the 2022 election."  Quote "'He's not an expert,'

25   Clements said of Peña."  Quote, "'We wouldn't rely on a

1  layperson that doesn't have discipline or subject matter

2  expertise to do the work that we did,'" end quote.

3      Now, I don't want you to tell me about any conversations

4  you may have had with your husband on this, but do you in

5  general agree with that statement that you never would have

6  relied on Mr. Peña to collect any information?

7  A.  The context of the information was to lawfully get data

8  from the election before certification that the commissioners

9  have access to.  They have the right to request it.  It can be

10  analyzed by an expert, and it can make a candidate or the

11  public at large comfortable or not with the conduct of the

12  election.

13  Q.  Right.  So with the question being, again, you never relied

14  on him as a layperson to collect data for the election in 2022,

15  did you?

16  A.  I'm not asking him to do the analysis.  I don't know that

17  he has the expertise to do that.

18  Q.  That's all I'm asking.

19      When were you first notified that you were going to be a

20  witness at this trial?

21  A.  When the *Albuquerque Journal* called me and said that there

22  was a voir dire scheduled.

23  Q.  Do you know what your anticipated testimony would be if you

24  testified at trial?

25  A.  No, I don't.

Q.  Okay.  And I believe that you -- and I know you're aware
that we have text messages between you and Mr. Peña.  It
appears from the text messages that your last contact with him
was around December 27th, 2022.  Does that sound accurate to
you?

A.  I really don't know.  I don't remember, and my phone was
reset by my five-year-old child, so I've lost those and I don't
know.

Q.  Just to be clear one more time, any actions he took related
to his election after the certification, you have no personal
knowledge of that?

A.  That's correct.

Q.  All right.  Has Mr. Peña said anything to you or talked to
you about any actions he was taking after certification, other
than any text messages?

A.  No.

        MR. CROSSWELL:  Your Honor, can I have a moment?

        THE COURT:  You may.

        MR. CROSSWELL:  I'm just trying to share an exhibit
with you, so bear with me.

Q.  (BY MR. CROSSWELL) Ma'am, can you see what I've put in
front of you?

A.  Yes.

Q.  Okay.  And was your phone number at the time -- did it end
in 4004?

1  A.  Yes.

2  Q.  And did you have any other phone number at that time?

3  A.  No, I didn't.

4  Q.  Okay.  Do you recognize that text message?

5  A.  Yeah.

6  Q.  Okay.  I'm going to read it to you and tell me if I've read

7  it accurately.

8      "I agree.  I'm sure they stole your race.  The only way I

9  know to disrupt the path to certification of this fraud is

10  through the county commissioners or candidates contesting this

11  election."

12      Have I read that accurately?

13  A.  Yes.

14  Q.  And is the date of that text message November 9th, 2022?

15  A.  Yeah.

16  Q.  So this is one day after the election?

17  A.  Okay.

18  Q.  Is that correct?

19  A.  I'm not sure.  Was it November 8th?

20  Q.  Yeah.

21  A.  Probably.

22  Q.  And at that point you had not examined any records related

23  to the 14th congressional district, had you?

24  A.  They're not available.  Again, the on- -- I was in the

25  middle of analyzing the Election Night Reporting data, which I

1  mentioned before, which showed -- and votes being injected in

2  huge numbers and removed again, and then after the election was

3  done, more votes were taken out, which is impossible in an

4  honestly conducted election.

5  Q.  And so from that you believe you had conclusive proof that

6  they stole his race?

7  A.  Well, this isn't -- there's a whole body of knowledge that

8  I have about how elections in New Mexico are -- probably not

9  his race.  I probably shouldn't have said that, but I did not

10 believe that election was honestly conducted because of the

11 data that I had and other things that are in my knowledge that

12 aren't pertaining to his race specifically.

13 Q.  So understand that we all send text messages sometimes and

14 they may not always be accurate, but under oath do you have

15 evidence his election was stolen?

16 A.  Well, I had his telling me that he had gone door to door

17 and had a very positive reaction.  He said he spent months,

18 worn himself out, and other people told me later that, "Yeah,

19 he did work really hard."  And to have a very positive reaction

20 and then to lose your race, it's highly suspect.  The same

21 thing was happening in other races, the statewide races that I

22 was analyzing.  I was in touch with multiple people who were

23 campaigning for candidates.  The polling data prior to the

24 election did not match at all the results afterwards, and then

25 we had the Election Night Reporting data, like I said.

1    Q.   So you're aware that he ran against an incumbent of who had

2    been in that seat since 1998, correct?

3    A.   No, I didn't know.

4    Q.   Okay.  And you're aware it's a very democratic district?

5    A.   Yeah, I am aware of that.

6    Q.   Okay.  And your basis for this was that he told you he

7    visited a lot of voters and had a positive reaction, plus

8    general information about statewide elections; is that correct?

9    A.   That's correct.

10   Q.   Okay.  Ma'am, do you see the exhibit I've put in front of

11   you?

12   A.   Uh-huh.

13   Q.   Okay.  And tell me if I'm reading this accurately.  Text

14   from Solomon Peña on 11/21/2022.  "I watched the Zoom.  The

15   Bernalillo County Board of Commissioners just certified a

16   fraudulent election."

17        Have I read that accurately?

18   A.   Uh-huh.

19             THE COURT:  Ma'am, if you could answer "yes" or "no",

20   it's hard to transcribe "uh-huh."

21             THE WITNESS:  Okay.  Yes.

22             THE COURT:  All right.  And, also, if you-all could be

23   careful not to speak over each other, it makes it very

24   difficult for the court reporter to transcribe.

25             You may proceed.

1    MR. CROSSWELL:  Thank you, Your Honor.

2  Q.  (BY MR. CROSSWELL) And can you read your response?

3  A.  I can't see it.  Can you scroll down?

4  Q.  Yes.

5  A.  It says "Cowards."

6  Q.  Okay.  And, again, at this point there was really nothing

7  left to do with regard to challenging the election, correct?

8  A.  I think there is still an option to file a legal challenge

9  in a court, if that's within the means of the candidate.

10  Q.  Okay.  But during the period after certification, were you

11  talking to Mr. Peña about this at all or advising him on doing

12  this?

13  A.  About filing a lawsuit?

14  Q.  Yeah.

15  A.  I typically don't think that ever goes anywhere, so I don't

16  advise people to put themselves in financial straits.

17  Q.  Okay.  And I guess a final time in this case and particular

18  actions he took, in particular, in December 2022, you have no

19  personal knowledge of that?

20  A.  No, I don't.

21    MR. CROSSWELL:  Your Honor, nothing further.

22    THE COURT:  Thank you.

23    Ms. Clements, this is Judge Riggs.  Before I allow

24  Ms. Honce to ask you questions, I'm -- I'm not sure I heard

25  your answer on one question that the United States asked, and I

1    wanted to follow up.

2            Did you advise Mr. Clements [*sic*], prior to the

3    certification of the election, to speak with county

4    commissioners personally?

5            THE WITNESS:  Mr. Clements or Mr. Peña?

6            THE COURT:  Sorry.  Mr. Peña.  Thank you for

7    clarifying that.

8            MS. CLEMENTS:  That is really the only way, because

9    like I said, the certification meeting is often without public

10   comment.  So if you have any issues with the election, if you

11   have any reason to doubt, if you want to ask them to look at

12   additional records before they rubber-stamp an election, your

13   only option is to set up a meeting with them and lay your

14   concerns out and ask them if they could take action before the

15   meeting, because there's often not any other opportunity.

16           THE COURT:  All right.  Thank you.  So that's a "yes"?

17           MS. CLEMENTS:  Yeah.  Yes.

18           THE COURT:  All right.  Thank you.

19           Any questions based on my question, Mr. Crosswell?

20           MR. CROSSWELL:  No, Your Honor.

21           THE COURT:  All right.  Ms. Honce, would you like to

22   question the witness?

23           MS. HONCE:  Yes, briefly.

24           THE COURT:  All right.  Could you pull the microphone

25   down, Ms. Honce, please?

1          CROSS-EXAMINATION

2     BY MS. HONCE:

3     Q.  Ms. Clements, I would ask you, in our discussions, have I

4     told you that I planned to inquire into the legitimacy of the

5     election or whether you think it was fraudulent or not?

6     A.  You've told me you have no such intention.

7     Q.  And when we talked about the subject of your testimony, was

8     I -- did I let you know what I intended to ask you about?

9     A.  I mean, just my interaction with Mr. Peña, to tell the

10    truth about the fact that he was trying to lawfully obtain

11    records according to what we've been advising the public in

12    general.

13    Q.  And I believe that I sent you two additional -- two of the

14    text messages that, I believe, were referred to today.  In the

15    one, you talk about Mr. Peña asked you if he should go around

16    and talk to the commissioners, and you tell him "yes," correct?

17    A.  Yeah.  That's the only way to make -- to get your concerns

18    heard.

19    Q.  And then in your further text updates do you not talk about

20    the progress and how that went?

21    A.  Like, the -- I don't have those texts anymore, like I said,

22    and I don't have them in front of me, but, yeah, I know that he

23    did discuss -- he did meet in person with someone, who -- I was

24    under the impression that lived in his neighborhood and he

25    knew.  I know he had that meeting.

1  Q.  Okay.  And do you know if Mr. Peña knew he had a right to

2  challenge the election in court or not at that time?

3  A.  I don't remember that we discussed it.  We probably did.  I

4  mean, when somebody says, "What are my options?"  That is an

5  option, if you have a lot of money to challenge an election,

6  but once something is certified, it becomes exponentially more

7  difficult to do anything about it.

8  Q.  Okay.  One moment.

9      Oh, I would ask you, when did you first meet -- if you can

10  remember, when did you first meet Mr. Peña in person?

11  A.  I don't know that I did meet him in person.  I don't

12  recall.

13  Q.  Okay.  Okay.  Do you remember attending a seminar at the

14  Baptist church?

15  A.  In the South Valley?  Yeah, I do remember that.  Was he

16  there?

17  Q.  So that would be you don't have a specific recollection,

18  but you remember going to that seminar?

19  A.  Yeah, I do.

20          MS. HONCE:  Okay.  I believe that's all I have.  Thank

21  you.

22          THE COURT:  Thank you, Ms. Honce.

23          Any redirect?

24          MR. CROSSWELL:  Very briefly, Your Honor.

25          THE COURT:  You may proceed.

1    <u>REDIRECT EXAMINATION</u>

2    BY MR. CROSSWELL:

3    Q.   Ms. Clements, I think I may have the message that Ms. Honce

4    was referring to, related to a recount, so I just wanted to

5    show you that.

6    A.   Okay.

7    Q.   Tell me if I'm reading correctly.  This is November 30th,

8    2022, from Mr. Peña to you, "Should I sue for a hand recount?

9    I want to, I just also want yours and David's input on the

10   matter."

11        Have I read that correctly?

12   A.   Yes.

13   Q.   And does -- is that your response?

14   A.   Yep.  Yes.

15   Q.   And is it -- and, again, let me just read this and you tell

16   me if I've read it correctly.  "I'm not sure.  They would

17   probably charge you a lot of money to do it, and it's likely

18   the paper will be there, because they're really good at making

19   the paper trail match their planned cheat with people voting

20   under names that aren't theirs or mailing in fraudulent

21   absentee ballots.  I don't know if it would change anything,

22   even though I'm sure they cheated."

23        Have I read that correctly?

24   A.   Yes.

25   Q.   So kind of consistent with what you testified to earlier,

1  it doesn't necessarily sound like you're endorsing filing a

2  lawsuit for recount.  Is that accurate?

3  A.  Yeah, I don't.  I mean, it would -- it typically bankrupts

4  people and -- just like I said there in the text.

5  Q.  Okay.

6        MR. CROSSWELL:  Just one more exhibit, Your Honor.

7  A.  Can I read that whole thing before you scroll down?

8  Q.  (BY MR. CROSSWELL) Absolutely.  I'm really just showing it

9  to you to establish that you kind of broke off contact, but

10  sure.

11  A.  Yeah, I don't recall this conversation and I don't have

12  these texts anymore.

13  Q.  Okay.

14  A.  Okay.

15  Q.  So it says, "Maybe a door-to-door canvass would work"; is

16  that correct?

17  A.  Yes.

18  Q.  Okay.  And I'm not asking you about this text message, but

19  I want you an opportunity to read it.

20  A.  Okay.

21  Q.  Okay.  Here's what I'm asking about, Ms. Clements.

22  Mr. Peña sends you text messages that reads, "Sí," on

23  November 30th, 2022, at 4:28 p.m.  Am I correct?

24  A.  Uh-huh.

25        THE COURT:  You have to answer "yes" or "no," please,

1   ma'am.

2            THE WITNESS:  Oh, yes.  I'm sorry.

3   Q.  (BY MR. CROSSWELL) Then the next text message is not until

4   December 26th, 2022; is that correct?

5   A.  Yeah.  It looks like it.  I can't verify if this is

6   complete, of course, but --

7   Q.  So, again, kind of consistent with what you testified to

8   earlier, you had very little interaction with him in the month

9   of December.  Is that accurate?

10  A.  Yes.

11  Q.  And I understand these are just text messages and there's a

12  gap between November 30th and December 26th.  Were you talking

13  to him on the phone?

14  A.  No.

15  Q.  Do you recall if you were e-mailing with him?

16  A.  No.

17  Q.  Do you recall any communication with him during that time

18  period?

19  A.  No, I don't.

20            MR. CROSSWELL:  Nothing further, Your Honor.

21            THE COURT:  May this witness be excused?

22            MR. CROSSWELL:  Yes, Your Honor.

23            THE COURT:  Any objection?

24            MS. HONCE:  No, Your Honor.

25            THE COURT:  All right.  Thank you, Ms. Clements.  That

1  concludes your testimony today.  If you wouldn't mind exiting

2  the room and sending your husband in, I would appreciate that,

3  ma'am.  Thank you.

4          MS. CLEMENTS:  Give me just a minute.

5          THE COURT:  Good morning, again, Mr. Clements.  Can

6  you hear the Court?

7          MS. CLEMENTS:  I can.

8          THE COURT:  All right.  Sir, the rule has been

9  invoked.  Is Erin Clements out of the room?

10         MS. CLEMENTS:  She's out of the room.

11         THE COURT:  Thank you very much.  I'm going to let the

12  United States begin questioning you, sir, when they're ready.

13     You may proceed.

14                        DAVID CLEMENTS

15             (being duly sworn, testified as follows:)

16                     DIRECT EXAMINATION

17  BY MR. CROSSWELL:

18  Q.  Good morning, Mr. Clements.

19  A.  Good morning.

20  Q.  Mr. Clements, have you ever met or talked to

21  Mr. Solomon Peña?

22  A.  I was reminded of a potential meeting with him at a rally

23  in Arizona, and I think I became aware of it after, you know,

24  the incident that happened in Albuquerque where people were

25  bringing up his name, and I'm pretty sure I met him in Arizona.

1  Q.  Okay.  And I don't want to ask about communications between

2  you and your wife, but is it your understanding that she did

3  have some communication with him?

4  A.  Yes.  She brought it to my attention.

5  Q.  Okay.  But you personally -- you might have met him at a

6  rally, but that's the only interaction that you can recall?

7  A.  There might have been one more in Otero County.  If memory

8  serves, he was running for office, so it wasn't unusual for

9  many republican candidates to go up to -- you know, to fairs or

10  public gatherings, and after -- I mean, I'm not absolutely sure

11  about that.  I'm pretty sure that I met him in Arizona at a

12  rally, but there might have been a second occasion as well

13  where he was there.

14  Q.  And if you're able, do you recall the time frame?  Like,

15  would that have been before or after the 2022 midterm

16  elections?

17  A.  He was campaigning, so it would have been before.

18  Q.  Okay.  How about after; do you think you had any

19  communication with him after the 2022 election?

20  A.  No.

21  Q.  Okay.  How about any text messages exchanged with him?

22  A.  No.

23  Q.  Any e-mails?

24  A.  Not than I'm aware of.  We -- my wife and I both have

25  utilized social media where we interface with tens of thousands

1    of people.  So if there's something in social media, there's a

2    possibility, but nothing from an e-mail standpoint or text

3    message.

4    Q.   Okay.  And I'm relying on a quote that you gave to the

5    *Albuquerque Journal* a couple days ago.  Quote, "He's not an

6    expert.  We wouldn't rely on a layperson that doesn't have a

7    discipline or subject matter expertise to do the work that we

8    did," end quote.

9         Suffice it to say, you've never used Solomon Peña for any

10   analysis collection or data collection or anything of that

11   sort?

12   A.   No.  The only way that we would have interfaced with a

13   layperson is if they happen to get access to a public record,

14   and then the analysis would in turn be done by our audit team.

15   Many people in our audit team had Q and SCI national security

16   clearances.  These are people that are retired from Sandia

17   National Labs or -- because it's very, very technical to be

18   able to analyze something like a cast vote record.

19        So I don't believe we ever received a public record from

20   Solomon, but it was not unusual for us to say, "Hey, if you

21   want greater granularity on understanding whether or not your

22   jurisdiction had a free and fair election, this thing called a

23   'cast vote record' is really helpful," and it was routine for

24   us to solicit those records so we could analyze them.

25   Q.   But you never had that conversation with him personally?

1    A.  I can't recall if that ever happened.  I don't think so.

2    Q.  Okay.  In your work have you ever done an analysis of the

3    District 14 race for the house of representatives in New Mexico

4    in 2022?

5    A.  I believe the team that I belong to, which includes my

6    wife, later got hold of a cast vote record that was in that

7    district, and there were some anomalies that gave my wife

8    pause, but it was after the fact.

9    Q.  And by "after the fact," do you mean after the shootings

10   occurred?  After the election?  When?

11   A.  It -- well, I know that the only thing that was available

12   was this thing called "Election Night Reporting," so you're

13   looking for patterns with a dataset, but it's a little bit

14   different than the cast vote record summary.  So in order to be

15   really be able for affirm or dispel a problem, you would want

16   to go to the cast vote record, and I know that my wife ended up

17   getting access to cast vote records in that area probably

18   months later for analysis, and we saw some anomalies there.

19   Q.  Okay.  And you are a former prosecutor, correct?

20   A.  Longtime State prosecutor, former law professor.

21   Q.  Okay.  So you're familiar with the concept of personal

22   knowledge being a requirement for a witness at trial?

23   A.  I am, but I also know there's exceptions to the hearsay

24   rule, like effect on the listener and things of that nature.

25   Q.  Absolutely.  But in your estimation, based on your

1    interaction or lack thereof of Mr. Peña, do you have any

2    personal knowledge of any actions that he took to challenge the

3    2022 election?

4    A.   I've read things in the paper, so it really depends on your

5    definition of "challenge."  From a lawful standpoint, what I

6    can testify to is being a corroborating witness.  So in the

7    event that my wife was impeached as to her truthfulness, I can

8    corroborate the things that she shared with me.  We're

9    certainly concerned about any instance in which someone's life

10   is potentially endangered, especially when a narrative is

11   contrived that investigating elections leads to this

12   consequence.  We're especially sensitive to that, and so we

13   want to make sure that people do things lawfully.  And so it

14   forced me and my wife to make sure that we reexamined our

15   communications and to look at the context of that encounter

16   with Solomon.  And so in that respect, I think there's a legal

17   way of testifying, but it really depends on what door's opened

18   by your attorney's office.

19   Q.   Well, let me ask you that in a different way.

20        If you testified, it would be limited to something that

21   your wife communicated to you, potentially corroborating what

22   she said?

23   A.   I believe so.

24   Q.   And it would not be related to personal knowledge of what

25   Mr. Peña was doing, based on our own interactions with him?

1  A.  I think my testimony would be limited to post-impeachment

2  examination of my wife.  I think that's the only thing that,

3  legally, I can think of is that.

4  Q.  Okay.  And that's because the only interaction you can

5  recall with Mr. Peña would have been prior to the election of

6  2022?

7  A.  That's correct.

8          MR. CROSSWELL:  May I have a moment?

9          THE COURT:  You may have.

10         MR. CROSSWELL:  Your Honor, nothing further.

11         THE COURT:  Thank you.

12         Ms. Honce, would you like to examine the witness?

13         MS. HONCE:  Just briefly, Your Honor.

14         THE COURT:  Go ahead.

15                      CROSS-EXAMINATION

16 BY MS. HONCE:

17 Q.  Mr. Clements, if you were called in a post-impeachment

18 situation, would you -- at the time that all this was going on,

19 where Mr. Peña was contacting your wife, did you discuss with

20 her, you know, her responses to him and how she should advise

21 him to proceed or anything like that?

22 A.  Advising, no, but I was -- if you look at texts out of

23 context, you know, most people there's a certain etiquette

24 before you go to their house.  And so, you know, our mayor, our

25 former mayor, lives behind us, and he's now a county

1    commissioner.  We have a relationship where it would not be

2    unusual for us to walk around, knock on the door and have a

3    conversation, because we have that.

4        And so one of the questions that I asked Erin was, "Well,

5    does Mr. Peña know the commissioner?"

6        I mean, that's -- I think that's a fair question, and she

7    mentioned that Solomon was familiar.  I think he referred to

8    him as his homey, lived in his neighborhood.  And so once you

9    hear that, it's, like, "Okay.  Well, there's context for the

10   text messages."

11       So I was concerned because I -- when you contacted me, you

12   showed me a proffered State's exhibit, and just a cold reading

13   of the text message doesn't provide the context of the phone

14   call, and without both, one looks really, really nefarious, and

15   the other one looks like it's -- you know, it's reasonable.

16              MS. HONCE:  Okay.  I believe that's all I have.

17              THE COURT:  Thank you.

18              Any redirect?

19              MR. CROSSWELL:  No, Your Honor.

20              THE COURT:  May this witness be excused?

21              MR. CROSSWELL:  Yes, Your Honor.

22              THE COURT:  All right.  Thank you.

23              Mr. Clements, that concludes your testimony today.

24   Thank you for your time this morning, sir.  You-all are free to

25   exit the Zoom meeting, if you would like to do so at this time.

1  You're also free to stay on and listen to the rest of this

2  hearing, which should not be very long.

3          MR. CLEMENTS:  Thank you, Judge.

4          THE COURT:  Yes.

5          All right.  All right.  Any argument at this time from

6  the United States?

7          MR. CROSSWELL:  Yes, Your Honor.

8          Your Honor, Federal Rule of Evidence 602 requires that

9  a witness have personal knowledge.  And so let's start with

10  Mr. Clements.  By his own admission, he had maybe one or two

11  interactions that he can recall with Solomon Peña.  It was

12  before the election.  Anything that he would testify to, I

13  think he said, would be corroborating something that his wife

14  said to him.

15          Now, he was proffered, I think, to support the idea

16  that Mr. Peña was pursuing legal and lawful ways to challenge

17  the election.  And be that as it may, he was not the person

18  having those communications at all.  Now, there was a few

19  comments that -- made in there that suggested something

20  nefarious about this prosecution, and I think that gets into

21  some of the risk that we talked about last time, is that this

22  is a witness with no knowledge that seems to have some beliefs

23  about how this case is being prosecuted, but just based on 602

24  alone, there is no basis for him to be testifying in this

25  trial, and if it comes up later that somehow he needs to

1   corroborate what his wife has said, then we can address it at

2   that point.

3        With regards to Ms. Clements, even there, Your Honor, no

4   one's contesting that initially Mr. Peña went and knocked on

5   doors of some commissioners, and no one's even contesting that

6   that's unlawful.  If that had been all he had done, we wouldn't

7   be here right now.  What is contested is what happened after

8   that election.  And as you saw, number one, Ms. Clements has

9   virtually no knowledge of that either; and, number two, even

10  her text messages show a gap from November 30th to

11  December 27th, the key time frame when all of this was going

12  on.  I had her repeatedly acknowledge she had no person

13  knowledge about what he was doing, about any information he was

14  collecting, about any actions he was taking.  She certainly

15  didn't advise him to conduct any surveillance, and she

16  certainly didn't advise him to conduct any shootings.

17       And so if the whole purpose of her testifying is just to

18  say that initially Mr. Peña wanted to challenge these elections

19  by asking the commissioners to get cast vote records, that will

20  be coming in from our own witnesses.  And, again, we're not

21  trying to limit Mr. Peña's defenses.  If his defense is he only

22  ever pursued legal means to challenge the election, that's

23  perfectly -- it's a legitimate defense, but these witnesses, by

24  their own admission, have no personal knowledge of what was

25  taking place after November 21st.

1    And, again, Ms. Clements was not making the comments about

2  the prosecution.  Mr. Clements was, but there's also some risk

3  here because there seems to be the opinion that this is -- I

4  think the word "nefarious" was used by Mr. Clements, so there's

5  also 403 risk there and what can be brought in front of the

6  jury.  And so, again, we would ask that these witnesses be

7  excluded, unless the defense can, at this point, offer some

8  explanation as to what relevant testimony they can offer to

9  which they have personal knowledge.

10         THE COURT:  Let me just ask you, while you're at the

11  stand, frequently the United States allows -- asks me to allow

12  testimony to put in context the actions, perhaps, of law

13  enforcement officers or witnesses that are going to testify.

14  What is your argument as to -- and that has been raised by

15  Ms. Honce.  What is your argument against allowing Ms. Clements

16  to testify to put his action -- the defendant's actions in

17  context with the understanding -- and this is getting quite

18  long, and I would probably get on to you if you were asking a

19  question this long, with the understanding that the Court is

20  very cognizant and very sensitive to jury nullification

21  arguments and relitigating the results of that election.

22         MR. CROSSWELL:  Well, Your Honor, first I think

23  there's been some suggestion that our text messages are taken

24  out of context, and I don't want to completely agree to this at

25  this point, because I guess I'd want to see which text message,

1    but my guess is, we would probably not object to the entire

2    text string being admitted between Mr. Clements and Mr. Peña,

3    and that's -- if we were to do that, then I don't think there

4    would be any reason to call Ms. Clements.  So that's the first

5    thing.

6         I guess secondly, that could be potentially something

7    we could address at trial, if we -- you know, defense found

8    there was some context that was missing, but I guess I'm

9    curious what context Ms. Clements could provide that would come

10   outside of text messages, based on her own testimony.  I mean,

11   it sounds like she gave very general advice that she said she

12   had given to others, "If you have questions of the election,

13   here's how you do it.  Here's how you challenge it, you ask for

14   these records, and you try to do it before certification."

15        So I think in regards to Mr. Clements, he absolutely

16   should not be allowed to testify at trial.  And then with

17   regard to Ms. Clements, I think the United States would

18   probably be willing to stipulate to the admissibility of all

19   the text messages.  Aside from that, it's just hard to respond,

20   because I guess I'm not understanding what context she's

21   expected to enter in, especially after what she just testified

22   to.  I don't think I've answered your question very well,

23   Your Honor.

24        THE COURT:  Well, sometimes there isn't an answer

25   until we're in trial and we know what has been presented and

 1   what's happening.  So I understand that.  Thank you.  I don't
 2   have any further questions.
 3            MR. CROSSWELL:  Thank you, Your Honor.
 4            THE COURT:  Ms. Honce, would you like to respond?
 5            MS. HONCE:  Yes, Your Honor, I would.
 6            We believe that Ms. Clements' testimony is relevant,
 7   and it -- the Government wishes to introduce in their exhibits
 8   photos of Mr. Peña approaching -- I believe it's
 9   Ms. O'Malley's -- what -- it turned out to be Ms. O'Malley's
10   daughter's house, but it shows him approaching, and then it
11   also -- they wish to present the testimony of, I believe,
12   Mr. and Mrs. Quezada, and without some context as to why he was
13   doing that, a jury could speculate that he was stalking them or
14   things like that.
15            But I think Ms. Clements' testimony makes it clear
16   that he had been talking to her about lawfully challenging the
17   result of his election and how could he do it, and she -- and
18   then he asked her in the text message, "Can I" -- "should I go
19   house to house?" or "Should I go visit the commissioners?"
20            And she says, "Yes," and then explains why and that it
21   would be a good idea.  Also, he talks about that --
22   Ms. Clements talks about that he knew the commissioner and that
23   he was going to go talk to him, which I assume is Mr. Quezada,
24   and that this gives context as to what he was doing and why he
25   was doing it; otherwise, I think a jury is just left out there

1    wondering why he was showing up at these commissioners' homes,

2    and I think that does explain it.

3            And as far as Mr. Clements, I think that we should be

4    able to present him -- or at least list him as a witness if

5    there needs to be impeachment corroboration.  As Your Honor's

6    saying, we won't know until the time she testifies, if there's

7    impeachment or not, and I do agree with the Government that the

8    only thing that he adds is that he basically met -- he believes

9    he met Mr. Peña a couple of times during the election season,

10   but that it was barely memorable, and -- but that he did work

11   and speak and confer with his wife about the -- her

12   communications with Mr. Peña.  Although he did not make

13   communications with Mr. Peña, it was only Ms. Clements.  But I

14   definitely believe that Ms. Clements' testimony is relevant and

15   necessary to the defense.  We would be hamstringed without it,

16   in a sense, because there would be no explanation as to why he

17   was on the porch or why he was at Mr. Quezada's house, even

18   though he did leave a paper that the text messages do show.  He

19   had shared with Ms. Clements as to the information that was

20   desired to be gathered.

21           And so for that reason -- and, also, the Government

22   here, I believe, is trying to inject conclusions, when I'm not

23   asking for conclusions as to the legitimacy of the election.  I

24   agree that there needs to be sensitivity to that and that we

25   all need to be careful with it.  I do not intend to ask for any

conclusions, I just intend to clarify for the jury as to why
Mr. Peña was going, initially, to these commissioners'
addresses and asking for this cast vote information.

        And so we do believe that Ms. Clements' testimony is
relevant and necessary for the defense and that Mr. Clements
should also be able to be listed as a witness for -- but could
be limited to post-impeachment corroboration.  Thank you,
Your Honor.

        THE COURT:  Thank you.

        Would you like to reply?

        MR. CROSSWELL:  Just briefly, Your Honor.  Ms. Honce
has represented multiple times that she is not going to ask
these witnesses about the election legitimacy, and we believe
that she won't, but that is what's our concern.  It's not that
maybe Ms. Clements said, "Go ask for these records," or "Do so
before certification."  It's the why.  It's this idea that, "We
saw fraud."

        And so I think if the testimony from Ms. Clements were
to be limited as to, "I advised him to do this," that might not
be a problem.  Our preference would be that we address it
before the witness is called in front of the jurors, again,
just to revisit this during trial.

        And then with regard to Mr. Clements, just because he
does not seem to have any personal knowledge and the idea he
may corroborate a witness is -- really, I think so limited and

1    the chance that would happen, that he not even be referred to

2    in opening statement and that -- again, I think as the Court

3    has said, neither of these witnesses are to testify as to their

4    findings or why they may have advised Mr. Peña to go speak to

5    the commissioners.  That's our concern that the jury's going to

6    be given information about the legitimacy of the election.  I

7    think as the Court said multiple times, it's not going to allow

8    that.  That's our concern as well.

9              THE COURT:  Thank you.

10             The Court does have a rule that I will advise you of

11   at the pretrial conference that if I have not ruled on an issue

12   that has been objected to, then it may not be alluded to or

13   discussed in voir dire or opening statement of this matter,

14   so -- and I believe one of those issues is the issue regarding

15   this spot shotter [*sic*].  And so I don't know if I'm going to

16   rule before trial on this or continue to take it under

17   advisement to see what happens, but I will let you know that.

18   So for right now I'm going to take it under advisement and

19   consider the testimony we have had today, and I will let you

20   know if I'm going to issue a ruling or not prior to trial.

21             We do have a pretrial conference coming up in a few

22   days, and you-all raised something that I would like for you to

23   do, if you have not already done so.  There are an extensive

24   amount of exhibits in this case.  Have you had an opportunity

25   to confer with each other to see if any of them can be

 1    stipulated to admissibility?

 2              MR. CORDOVA:  Your Honor, I can speak to that.  The

 3    United States had requested admissibility of all of the text

 4    messages, at least to stipulate to authenticity.  At this point

 5    Ms. Honce has objected to that.  I think she requested

 6    stipulation to some of the Clements' texts.  We can certainly

 7    stipulate to the authenticity to some of those.  So that's

 8    where we stand.  Most are text messages, so that stipulation's

 9    on the table if Ms. Honce is willing to agree.

10              THE COURT:  Well, I can tell you that I have been

11    through the exhibit -- and I'm not asking you to put it on the

12    record today.  If you-all would just talk about it after this

13    hearing, I have been through the exhibits for both sides, and

14    there are some duplications, and the Court will not admit

15    duplications if they are the same thing.  It's just too

16    confusing for the jury.  So just to let you know that.  So if

17    you-all could talk about that prior to our pretrial conference

18    in a few days, I certainly would appreciate that.

19              I will tell you our first proposed jury instructions

20    went out this morning, and are asking for responses to those, I

21    believe, next week, Monday.

22              Is that right, Ms. Bevel?

23              COURTROOM DEPUTY:  Yes, Your Honor, Monday the 23rd.

24              THE COURT:  All right.  Thank you.

25              Anything else that we need to take up this morning

1    from the United States?

2    MR. CORDOVA:  Your Honor, I just wanted to alert the

3    Court and Ms. Honce in case she didn't notice, the proposed

4    scheduled we submitted to Your Honor had a witness on there

5    that wasn't on our witness list.  It's a chain of custody

6    witness, Ms. Kalin Woods -- or Mr. Kalin Woods [*sic*].  We'll

7    amend our witness list to add him.  If you look at the witness

8    list, I think there's a footnote on there about reservation for

9    chain of custody witnesses, but that's what he would be.  He

10   would be admitting a cartridge that he found at one of the

11   crime scenes.

12   A.  I did notice that.  I also noticed that there was one on

13   there that was not on her list, I believe, and I wondered if

14   this was a chain of custody, Amadeo Griego.  I don't believe

15   that was on your witness list, or did I miss it?

16   MS. HONCE:  No.  We did amend -- we filed an amended

17   witness list with his name, and he is actually relevant to the

18   motion that Your Honor has taken under advisement regarding the

19   spot shotter [*sic*] and his spot shotter contract, and he -- I

20   believe he installs them and has the contract, so -- that's

21   all.

22   THE COURT:  All right.  And I didn't mean to get into

23   the pretrial conference.  We have that later this week.

24   Anything else on behalf of the United States?

25   MR. CROSSWELL:  Your Honor, just -- can we request the

```
 1   transcript for today's hearing of the two witness' testimony?
 2           THE COURT REPORTER:  I'll get with you after the
 3   hearing.
 4           THE COURT:  Anything further on behalf of the
 5   defendant?
 6           MS. HONCE:  I'm sorry, Your Honor, I was conferring
 7   with my client.
 8           THE COURT:  I apologize.  Anything further on today?
 9           MS. HONCE:  No, Your Honor.  Thank you.
10           THE COURT:  Thank you.
11           We'll be in recess regarding this hearing.  Have a
12   good day.
13       (Proceedings adjourned at 10:03 a.m.)
14                           * * * * *
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF NEW MEXICO

 3     _____
                                     )
 4     UNITED STATES OF AMERICA,     )      No. 1:23-cr-00748-KWR
                                     )
 5              Plaintiff,           )
                                     )
 6          vs.                      )
                                     )
 7     SOLOMON PEÑA,                 )
                                     )
 8              Defendant.           )
       _____)

 9

10           CERTIFICATE OF OFFICIAL COURT REPORTER

11          I, Andrea M. Lynch, RPR, New Mexico CCR #127, Federal

12     Official Court Reporter, in and for the United States District

13     Court for the District of New Mexico, do hereby certify that

14     pursuant to Section 753, Title 28, United States Code, that the

15     foregoing is a true and correct transcript of the

16     stenographically reported proceedings held in the

17     above-entitled matter on September 16, 2024, and that the

18     transcript page format is in conformance with the regulations

19     of the Judicial Conference of the United States.

20     Dated this 18th day of September, 2024.

21

22     _____
       ANDREA M. LYNCH, RPR, NM CCR #127
23     FEDERAL OFFICIAL COURT REPORTER
       333 Lomas Boulevard Northwest
24     Albuquerque, New Mexico  87102
       Phone:  (505) 348-2093
25     Email:  Andrea_Lynch@nmd.uscourts.gov
```