IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cr. No.:  23-748-KWR |
| | ) | |
| **SOLOMON PEÑA**, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

### Introduction

Defendant Solomon Peña planned and carried out a series of four shootings at the homes of completely innocent elected officials and their families.  The terror that those officials and families felt was real – but his real target was the American political system.  He attacked the principle that citizens should be able to run for and hold public office without fear of violence. He hoped to cause political change by terrorizing people into being too afraid to engage in political life if they held views contrary to his own.  Fortunately, he failed.  His legitimate electoral loss stands, and none of the officials he targeted stepped back from political life.

Despite his failure and the terror he created, Defendant has shown no remorse.  Instead, he escalated his methods, offering thousands of dollars to any inmate who would kill his co-conspirators – his own one-time friends – to thwart his prosecution.  His efforts caused those co-conspirators to be threatened, attacked, and harmed in jail, but once again, he failed.  Now, two and a half years after he first turned to political violence, it is time for him to face justice.

## I.     Procedural history

On May 24, 2023, a federal grand jury in the District of New Mexico returned an indictment alleging that Defendant and his co-conspirators committed 9 crimes arising out of Defendant's scheme (co-defendant Jose Trujillo was charged solely in Counts 10 and 11).  Those crimes were:  Count 1, conspiracy, in violation of 18 U.S.C. § 371; Counts 2-5, interference with federally protected activities, in violation of 18 U.S.C. § 245(b)(1)(A); Counts 6-8, using and carrying a firearm during and in relation to a crime of violence, and possessing a firearm in furtherance of such crime, and discharging said firearm, contrary to 18 U.S.C. § 924(c)(1)(A)(iii); and Count 9, using and carrying a machine gun during and in relation to a crime of violence, and possessing a firearm in furtherance of such crime, and discharging said firearm, contrary to 18 U.S.C. §§  924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).  Doc. 33.

On June 7, 2023, Defendant entered federal custody on the charges.  Docs. 55, 56.  On January 8, 2024, co-defendant Jose Trujillo entered into a plea agreement in which he pled guilty to several crimes and agreed to testify against Defendant.  Doc. 118.  On February 1, 2024, co-defendant Demetrio Trujillo entered into a plea agreement in which he pled guilty to several crimes and agreed to testify against Defendant.  Doc. 128.  On March 26, 2024, a grand jury returned a superseding indictment naming only Defendant, alleging the original nine crimes and adding one count of being a felon in possession of a firearm and ammunition, contrary to 18 U.S.C. § 922(g), and three counts of solicitation to commit a crime of violence contrary to 18 U.S.C. § 373.  Doc. 147.  On January 23, 2025, a grand jury returned a second superseding indictment reiterating the charges in the superseding indictment with only technical changes.  Doc. 315.

On March 10, 2025, the Court commenced a jury trial on the charges in the second superseding indictment. On March 19, 2025, the jury returned a verdict finding Defendant guilty on all counts. On May 21, 2025, the Court sentenced co-defendant Demetrio Trujillo to a term of 15 years imprisonment. On May 22, 2025, the Court sentenced co-defendant Jose Trujillo to a term of 37 months imprisonment.

## II.    Sentencing Factors

### A.    The Nature and Circumstances of the Offense

The facts of the case are now familiar to the Court. In November 2022, Defendant lost the election to become New Mexico State Representative in District 14, Bernalillo County. Rather than accept the results of the fair election, Defendant claimed that the election had been rigged against him. In the weeks after the election, Defendant visited the homes of Bernalillo County Commissioners Adriann Barboa, Debbie O'Malley, and Steven Quezada, who were tasked with the certification of the election results. He argued that the results could not be valid because he believed he had worked too hard to receive so few votes. His protestations, unsupported by any evidence, did not sway the Commissioners, who certified the election.

Defendant vowed revenge. He recruited Jose Trujillo, a "21 year young youngster," whose mother was in a relationship with Defendant's former cellmate from his years in state prison. Defendant had provided assistance, including cash, food, and rides, to Jose and his family since his release from prison, and now he called in a favor. He paid Jose hundreds of dollars and instructed him to set fires, break windows, and slash tires at the homes of the Commissioners. Jose pocketed the money but did not do the tasks. Defendant complained to Jose's mother that Jose owed Defendant a debt, and she told Jose's father, Demetrio Trujillo. Demetrio agreed to fulfill his son's debt by completing the tasks. But this time, Defendant

3

demanded a more forceful attack: he told Demetrio to shoot up certain homes. Defendant gave Demetrio the address for Commissioner Barboa's residence and demanded video proof of the shootings. At 4:40 p.m. on December 4, 2022, Demetrio fired eight shots into Commissioner Barboa's home, where she had been putting up Christmas decorations with her family only minutes before. Defendant paid Demetrio for the shooting but told him to be "more aggressive" next time. That next time came only a few days later. At 6:51 a.m. on December 8, 2022, Demetrio fired eight shots into the home of State Representative Javier Martinez, where Dianna Martinez and their children were starting their day. Again, Defendant paid Demetrio for the shooting but expressed disappointment that the shooting was not more aggressive.

Defendant did not tell Jose that Demetrio had cleared the debt. Instead, a few days later, he woke Jose up and demanded assistance with his next attack. Jose, still intoxicated from a day of partying, agreed. Defendant directed them to Commissioner O'Malley's house, and at 1:41 a.m. on December 11, 2022, Jose fired twelve shots at the house where O'Malley and her husband were sleeping. Defendant continued to nag at Jose to "handle" some more "business," and on the night of January 2, 2023, Jose and Demetrio agreed to help with another shooting. At 12:37 a.m. on January 3, 2023, Jose fired twelve rounds from a fully-automatic machine gun at the house where State Senator Linda Lopez and her children were sleeping. Defendant himself fired once, but the gun he was using jammed.

Later that night, a Bernalillo County Sheriff's Deputy stopped Jose Trujillo while Jose was driving Defendant's car with the guns they had used in the trunk. Jose was arrested, and law enforcement connected the guns to the Lopez shooting. Demetrio learned about Jose's arrest and decided to come clean. A few days later, following his arrest for driving a stolen car, Demetrio told law enforcement that he had committed the shootings and explained that Defendant had paid

him to do the shootings because the election had been rigged against him and because the
Commissioners had "laughed" at his protests concerning the election results.

Days later, Albuquerque Police Department officers arrested Defendant.  Defendant
quickly realized that Demetrio had cooperated with law enforcement and began asking cellmates
in jail how to kill Demetrio to prevent him from testifying.  Defendant arrived in federal custody
several months later and continued asking for help killing Demetrio.  He offered one inmate
$10,000 and a car if that inmate could arrange Demetrio's murder, and the two discussed plans
for how they could cause Demetrio to die by drug overdose while making it look like an
accident.  When Defendant was able to speak with Jose, he told Jose that they needed to
"eliminate" Demetrio to beat the case against them.  Defendant was transferred to a different jail,
but Defendant continued to extend the same offer to inmates at the new jail:  $10,000 and a car to
anyone who kills Demetrio or Jose, who by then had pled guilty and agreed to testify for the
United States.

Defendant's motives were political, on the personal, local, and national levels.  He acted
out of personal political motivation to seek revenge against the officials who had certified the
results of his electoral contest and "laughed" at him while doing it.  He acted out of a desire to
influence state and local politics, to intimidate members with political beliefs contrary to his
beliefs, and to discourage them from running for or holding office by showing that they would be
"held accountable" for taking political stands that he opposed.  He acted out of a desire to engage
with national politics, to fight back against what he saw as the "oligarchs" who had "rigged"
previous elections.  He chose violence and intimidation as his tools to achieve his personal, local,
and national political objectives.

The victims Defendant targeted include committed public servants and their families, all completely innocent of any wrongdoing.  Senator Lopez testified that the bullets that ripped into her house entered her bedroom and her daughter's bedroom.  A bullet flew just over her daughter as she slept.  Commissioner Barboa testified that the bullets passed through her living room, where her granddaughter had been playing only a short time before.  Diana Martinez testified that she heard and felt the shots as she was getting ready to wake her children for school.  Commissioner O'Malley testified that she and her husband sat up in bed when they heard the gunshots so close to their home.  Each of them suffered the trauma of a direct, targeted attack.  Defendant's threat was clear: he would use violence against them and their children if they did not do as he wanted.  Demetrio testified that Defendant had a list of dozens of targets.  It was inevitable that an innocent person would be hurt or killed if Defendant was not stopped.

Defendant's only response to obstacles has been to escalate.  First, he paid for vandalism.  Then he paid for shootings.  Then he personally went to the scene of the O'Malley shooting.  At the Lopez shooting, he personally fired a shot.  Upon his incarceration, he then escalated by soliciting others to murder witnesses.  He has proven that he will not be swayed from his course, and only the justice of the law will stop him.

### B. The History and Characteristics of the Defendant

Defendant has never been married and has no children.  PSR, ¶ 141[1].  He is not close with his family.  PSR, ¶ 136.  His profession is "storm chasing," which is the practice of defrauding insurance companies by repairing nonexistent damage.  PSR, ¶ 139.  It is difficult to identify any factor that could excuse his conduct or cause the Court to hesitate in imposing the full justice of the law.

---

[1] PSR references are to the Presentence Report filed on August 5, 2025 (Doc. 397).

C.  Public policy considerations

A substantial term of imprisonment is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.  Defendant's actions constitute a significant escalation of political and personal violence.  His project, his mission, is to undermine our Republic through fear and violence.  A representative republic cannot exist if citizens are afraid to run for office, to vote, or to count votes.  A substantial term of imprisonment is likewise necessary to afford adequate deterrence to others who would follow a similar path.

III.    Sentencing guidelines

A.  Offense Level

The PSR calculates a total offense level of 42.  PSR, ¶ 118.  The United States concurs with the PSR's calculation.  The calculation is based on grouping rules for determining the offense level of a case involving several crimes.  The offense levels do not stack, so the overall punishment indicated by the sentencing guidelines is less than the sum of the sentences for the crimes if they had been committed in isolation.  In this instance, if Defendant had committed only a single offense of soliciting to kill a witness, his offense level would have been 39.  PSR, ¶ 99.  Adding all his other crimes – the conspiracy, the four shootings, being a felon in possession, soliciting another person to kill two witnesses – added only three levels to his total offense level for guideline purposes.

B.  Criminal History Category

The PSR calculates a criminal history category of IV.  PSR, ¶ 127.  This is based on three separate state criminal cases, which resulted in criminal convictions for auto burglary, receiving stolen property, conspiracy, commercial burglary, and larceny.  PSR, ¶¶ 123-125.  He was

arrested in 2007, sentenced in 2009, and released from prison to probation in 2016. PSR, ¶ 125. He completed his probation in 2021 and committed the instant offenses less than two years later. *Id*.

A criminal history category of IV with an offense level of 42 indicates a guideline imprisonment range of 360 months (30 years) to life imprisonment. Parenthetically, an offense level of 39 – which, as noted above, Defendant would have earned with only a single conviction for solicitation to kill a witness – combined with a criminal history category of IV also yields a guideline imprisonment range of 360 months to life imprisonment.

    C.  <u>Mandatory Time</u>

Counts 6 through 8 each carry a minimum term of imprisonment of 10 years, and up to life imprisonment, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii). Count 9 carries a minimum term of imprisonment of 30 years, and up to life imprisonment, pursuant to 18 U.S.C. § 924(c)(1)(B)(ii). These mandatory terms must run consecutively to each other and consecutively to any other sentence on any other charge. § 924(c)(1)(D). Therefore, the sentence must include 60 years of mandatory imprisonment, to run consecutively to the sentence computed above. The total guideline range is therefore 90 years to life imprisonment.

**IV.   Fine**

The Sentencing Guidelines provide that the court "shall impose a fine in all cases," except when the defendant establishes that he is unable to pay a fine. U.S.S.G. § 5E1.2. The guideline fine range for offense levels 38 and above is $50,000 up to the statutory maximum, which is $250,000 for each offense. § 5E1.2(c)(3). Defendant has not provided reliable information establishing an inability to pay. *See* PSR, ¶¶ 151-155. He owns real property and multiple vehicles. *Id*. Therefore, a fine is appropriate. The United States recommends that the

Court impose a fine of $250,000, representing the high end of the guideline range.  In addition, a special penalty assessment of $100 per count of conviction is mandatory.  *See* PSR, ¶ 166.

V.    **Restitution**

The United States requests and recommends entry of a restitution order pursuant to 18 U.S.C. § 3663A to the extent that victims present claims to U.S. Probation.  *See* PSR, ¶ 170.

**Final Request and Recommendation**

Therefore, for the above reasons, the United States requests and recommends that the Court sentence Defendant to a guideline term of 90 years to life imprisonment, followed by five years of supervised release; order restitution as may be claimed by the victims; impose a fine of $250,000; and impose special penalty assessments totaling $1,300.

Respectfully submitted,

RYAN ELLISON
U.S. Attorney

/s/ *Jeremy Peña*
JEREMY PEÑA
PATRICK E. CORDOVA
Assistant United States Attorneys
P.O. Box 607
Albuquerque, N.M. 87103
(505) 224-1413

EDWARD P. SULLIVAN
Acting Chief, Public Integrity Section

WILLIAM GULLOTTA
Trial Attorney
Public Integrity Section
U.S. Dept. of Justice, Criminal Division

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2025, I filed the foregoing document electronically through the CM/ECF system, which caused the foregoing to be served on all counsel of record.

/s/ *Jeremy Peña*
Jeremy Peña
Assistant United States Attorney